**UNITED STATES, Appellee,**

v.

**Colonel Lawrence R. MACK, United States Army, Appellant.**

**ARMY 9900727.**

U.S. Army Court of Criminal Appeals.

22 March 2002.

For Appellant: Colonel Adele H. Odegard, JA (argued); Lieutenant Colonel David A. Mayfield, JA; Major Mary M. McCord, JA (on brief); Lieutenant Colonel E. Allen Chandler, Jr., JA; Major Jonathan F. Potter, JA.

For Appellee: Captain Karen J. Borgerding, JA (argued); Colonel Steven T. Salata, JA; Lieutenant Colonel Denise R. Lind, JA; Major Margaret B. Baines, JA (on brief).

Before WRIGHT, Chief Judge, CAIRNS, Senior Judge, and BROWN, Appellate Military Judge.

## OPINION OF THE COURT

BROWN, Judge:

A military judge sitting as a general court-martial convicted the appellant, pursuant to

his pleas, of making false official statements (three specifications) and larceny (fourteen specifications), in violation of Articles 107 and 121, Uniform Code of Military Justice, 10 U.S.C. §§ 907 and 921 [hereinafter UCMJ].[1] The military judge sentenced the appellant to a dismissal, forfeiture of all pay and allowances, and confinement for six months, but recommended that the convening authority suspend the sentence.[2] Pursuant to a pretrial agreement, the convening authority deferred confinement for forty days to enable the appellant to obtain medical treatment, but subsequently denied the appellant's request for additional deferral of confinement. In the exercise of his clemency power, the convening authority: (1) deferred forfeitures from their effective date until action;[3] (2) disapproved the adjudged forfeitures at action; and (3) waived automatic forfeitures for six months from the date of action. The convening authority approved the remainder of the sentence—dismissal and confinement for six months—as adjudged.

Pursuant to our review under Article 66, UCMJ, we have considered the record of trial (ROT), the briefs submitted by the parties, the matters personally raised by the appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982), and oral argument on four of the appellant's six assignments of error. We hold that no error materially prejudiced a substantial right of the appellant, that the findings and sentence are correct in law and fact, and that the sentence is appropriate. *See* UCMJ arts. 59(a), 66(c), 10 U.S.C. §§ 859(a), 866(c). We find no merit in any *Grostefon* matter.

## BACKGROUND

The appellant served as the Installation Staff Chaplain for the U.S. Army Air De-

---

1. Prior to pleas, the military judge dismissed a charge and its specification alleging conduct unbecoming an officer and gentleman, in violation of Article 133, UCMJ (10 U.S.C. § 933). Additionally, prior to findings, the military judge dismissed twelve other specifications of making false official statements as an unreasonable multiplication of charges. *See* Rule for Courts–Martial [hereinafter R.C.M.] 307(c)(4) discussion.

2. After announcing the sentence, the military judge stated, "Based upon this entire record[,] I recommend that the sentence be suspended." The SJAR advised the convening authority of the

military judge's clemency recommendation, as required by R.C.M. 1106(d)(3)(B).

3. Shortly after trial, the convening authority originally purported to disapprove the appellant's request for deferral of forfeitures, but approved a waiver of forfeitures for a period of three months pursuant to Article 58b(b), UCMJ, 10 U.S.C. § 858b(b). At action, the convening authority clarified that his initial intent was to defer forfeitures for a period of three months. This deferral period was terminated at the time of action pursuant to Articles 57(a)(2) and 58b(a)(1), UCMJ.

fense Artillery Center and Fort Bliss, Fort Bliss, Texas. Between 22 September 1998 and 30 April 1999, he stole a total of $73,557.75 from the Fort Bliss Consolidated Chaplains' Fund (CCF).

In his capacity as the Installation Staff Chaplain, the appellant had oversight responsibility for the CCF and for expenditures made therefrom. He used his knowledge of the CCF procedures and his position of responsibility to develop a detailed scheme to commit fourteen separate larcenies. In each instance, the appellant requested that the CCF Clerk, a subordinate, write a check drawn on the CCF to "Covenant House" for the purchase of hundreds of religious books or pamphlets. Rather than standard purchase orders, the appellant submitted handwritten requests for the checks. Because of the appellant's rank and position, the CCF Clerk questioned neither the deviation from normal procedures nor the legitimacy of the appellant's request. In each instance, the CCF Clerk made a check payable to "Covenant House" and gave the check directly to the appellant. The checks ranged in amount from $2,122.00 to $9,662.00. In reality, "Covenant House" was a fictitious business entity.

As part of his scheme, the appellant opened an account at a bank in the name of "Covenant House." The appellant was the only signatory on the account. As he received checks from the CCF Clerk, the appellant took the checks and deposited them into this bank account. Once the checks were deposited into the "Covenant House" account and cleared, the appellant would access the funds. The appellant withdrew money from the account to support his gambling addiction. He gambled in various casinos in several states and lost most, if not all, of the money he stole. On eleven duty days, he gambled at a casino in El Paso during duty hours.

The appellant's subordinates trusted and respected appellant and did not know that appellant was stealing money. Incident to each larceny, the appellant submitted a falsified invoice, indicating that the religious books had been purchased, paid for, and received in good condition. Over time, even

his loyal, trustful subordinates became suspicious of the appellant's activities. When confronted, the appellant lied to his subordinates regarding how the money was used. As suspicion mounted, he likewise lied to other chaplains and to the Garrison Commander about using the money for religious books. When asked where the ordered books were stored, appellant lied and said that he had already distributed the books. He gave the Garrison Commander a phone number and a point of contact for "Covenant House." The person who answered the phone at the contact number said that she had sold the appellant some religious books. However, further investigation revealed that the person who answered the phone was appellant's sister, and she had not sold the appellant any religious books. Thus, appellant involved his sister in his scheme.

During his sentencing case, the appellant presented evidence that he is a pathological gambler. He has also been diagnosed as suffering from post-traumatic stress disorder due to his combat experiences and to his sexual abuse as a child. His gambling addiction is connected to his post-traumatic stress disorder. His sentencing case also detailed a twenty-three year military career of otherwise dedicated, selfless, and often-valorous service.

Among his assignments of error, the appellant alleges that: (1) the staff judge advocate's (SJA) post-trial recommendation (SJAR) fails to comply with the requirements of R.C.M. 1106 in that the SJAR and its addendum do not accurately and completely portray the appellant's service record; (2) his sentence to a dismissal is inappropriately severe; and (3) the convening authority, as an accuser, was disqualified from convening the court and taking action in the appellant's case.

## DISCUSSION

### A. Accuracy and Completeness of the SJAR and Its Addendum [4]

Like our superior court, this court continues to be perplexed by inaccurate, incomplete

4. As one of his *Grostefon* issues, the appellant asserts that he was prejudiced in the preparation

SJARs in all too many cases that come before us. *See, e.g., Wheelus,* 49 M.J. at 284; *United States v. Nicholson,* 55 M.J. 551, 553 (Army Ct.Crim.App.2001). Likewise, we are troubled that many of these errors and omissions escape notice and comment by trial defense counsel, as contemplated by R.C.M. 1106(f)(4). The appellant's case presents us with no such concerns.

On appeal, the appellant alleges that the SJAR grossly misstates his service record by: (1) omitting mention of his award of the Purple Heart; (2) mischaracterizing his service as "satisfactory;" and (3) failing to provide details concerning his combat service and awards. In an extensive R.C.M. 1105 submission, the appellant and his trial defense counsel commented on or otherwise addressed each of these issues. The appellant further alleges that the SJA, at least tacitly, disputed portions of the R.C.M. 1105 submission by failing to specifically address—and agree with—their assertions in the SJAR addendum. To remedy the alleged errors and omissions in the SJAR and addendum, the appellant requests that this court return the case for a new review and action, by a different SJA and convening authority.

Rule for Courts–Martial 1106(d) establishes the form and content for an SJAR. The SJAR "shall be a *concise* written communica-

tion" that includes, in part, "[a] *summary* of the accused's service record, to include length and character of service, awards and decorations received, and any records of nonjudicial punishment and previous convictions." R.C.M. 1106(d)(2), (3)(C) (emphasis added).

In the appellant's case, the SJAR listed verbatim every award and decoration from the appellant's Officer Record Brief (ORB). This list included two awards for valor—a Bronze Star Medal and an Army Commendation Medal.[5] The SJAR did not mention a Purple Heart, presumably because it is not listed on the appellant's ORB that was admitted at trial without defense objection. This omission of the Purple Heart from the ORB, and thus from the SJAR, is understandable. As the appellant explained in his unsworn statement, he did not feel that he deserved the award of the Purple Heart and that he "threw [the orders] away."

■■■ The appellant has cited no authority—and we decline to establish any—that an SJAR must include awards and decorations, which are not either supported by an appellant's service record admitted at trial (e.g., ORB, other official military records, soldier's copies of citations or orders, etc.) or established by stipulation of the parties. *Accord United States v. Perkins,* 40 M.J. 575 (N.M.Ct.Crim.App.1994) (for purposes of

---

and submission of his clemency matters because he was not served personally with a copy of the ROT and the SJAR, as required by R.C.M. 1104(b)(1) and 1106(f)(1), respectively. *See also* Article 54(d), UCMJ, 10 U.S.C. § 854(d) (requiring that "[a] copy of the record of the proceedings … shall be given to the accused as soon as it is authenticated"). The appellant concedes that *after* the convening authority took action, he eventually received both documents, albeit not from the SJA office. Regarding his lack of opportunity to review the ROT, the appellant asserts no error or omission in the ROT and alleges no specific prejudice from his delayed opportunity to review the ROT. As to his failure to be timely served with a copy of the SJAR, he essentially reiterates the same perceived errors and omissions addressed elsewhere in this section of the opinion. While it was clear error for the SJA to fail to serve the appellant with a copy of the ROT and the SJAR, the appellant has made no colorable showing of possible prejudice. Therefore, he is entitled to no relief. *See United States v. Powell,* 49 M.J. 460, 464–65 (1998); *United States v. Wheelus,* 49 M.J. 283, 289 (1998). Nev-

ertheless, we continue to express our concern about SJAs who, through inattention or indifference, fail to fulfill *all* of their basic post-trial responsibilities.

5. The appellant notes two valor awards in his affidavit (Defense Appellate Exhibit A) attached to his brief. Our examination reveals that both valor awards were based on the same incident, which occurred on 28 February 1991 in Kuwait, but were approved by different headquarters. We presume, but need not decide, that the lesser award was an interim award since "[o]nly one decoration will be awarded to an individual for the same *act,* achievement, or period of meritorious service." Army Reg. 600–8–22, Personnel–General: Military Awards, para. 1–18*a* (25 Feb. 1995) (emphasis added). Nevertheless, since the appellant included a copy of both orders (with identical citations) that announced the valor awards, and since both awards were annotated on his ORB and in the SJAR, we are confident that the appellant suffered no possible prejudice. *Wheelus,* 49 M.J. at 289.

preparing an SJAR, an SJA may rely on official records in determining the awards to which the appellant is entitled). During sentencing, several defense witnesses mentioned [6] the Purple Heart, but the award was not reflected in the appellant's service record. To be clear, we do not question the appellant's award of the Purple Heart. We simply hold that, under the circumstances of this case, it is not error—plain or otherwise—for the SJAR to omit mention of the Purple Heart. *See Powell,* 49 M.J. 460; *Wheelus,* 49 M.J. 283. *See also* R.C.M. 1106(d)(3)(C). Regardless, both the trial defense counsel and the appellant cured any possible omission from the SJAR when they referred to the Purple Heart in the R.C.M. 1105 submission.[7] *See* R.C.M. 1105(b)(1), 1106(f)(6).

■ We also find no error in the characterization of the appellant's service as "satisfactory." Rule for Courts–Martial 1106(d)(3)(C) provides no guidelines or word template to characterize service. In our experience, few SJAs use superlatives to describe the overall service of a court-martialed soldier, notwithstanding that soldier's rank or prior stellar record. Many SJAs simply use "satisfactory," "unsatisfactory," or similar terms to summarize an accused's overall service. We note, as the appellant repeatedly does, that the appellant and the convening authority knew each other well. We are confident that the convening authority was not misled by the use of the term "satisfactory" in the SJAR.

■ The appellant faults the SJAR and addendum for failure to provide *details* of the appellant's combat service and awards. Regarding the level of detail required in the SJAR, the appellant cites *United States v. Barnes,* 44 M.J. 680 (N.M.Ct.Crim.App.1996). In *Barnes,* the SJAR failed to mention the appellant's recent (less than one-year old) award for combat service in Somalia. This award, a Navy Commendation Medal, was apparently reflected in the appellant's service

record or was admitted at trial. *Id.* at 682 n. 3. Neither the appellant nor his counsel submitted any response to the SJAR. Our sister service court found the omission of the recent combat award to be plain error, set aside the convening authority's action, and directed a remand for a new SJAR and action. The holding of *Barnes* also seems to suggest that an SJAR must include some narrative discussion about a service member's duty position, responsibilities, and length of service in a combat theater. *See id.* at 682. We consider such detail beyond that required by R.C.M. 1106(d)(3)(C). To the extent that our Navy–Marine Corps brethren require such award detail, we decline to adopt their decision.

■ Finally, the appellant faults the SJAR addendum for failure to comment favorably upon the appellant's R.C.M. 1105 submission. In our view, the SJA complied fully with the requirements of R.C.M. 1106. The fact that the appellant wishes to add information or to cast existing information in a different light, as it is his right to do under R.C.M. 1105(b) and 1106(f)(4), does not necessarily require a response from the SJA. The SJA is only *required* to comment on alleged legal errors. R.C.M. 1106(d)(4). The SJA *may* supplement the SJAR by commenting on other issues raised by the appellant. R.C.M. 1106(f)(7); *see also United States v. Curtis,* 44 M.J. 106, 163–64 (1996). The appellant suggests that we equate the SJA's decision not to comment on the appellant's extensive clemency matters as tantamount to disagreeing with or disputing matters in the appellant's R.C.M. 1105 submission. We are aware of no authority to support the appellant's position, and we decline to establish any such authority.

In summary, the SJAR and addendum comply with the letter and spirit of R.C.M. 1106. We do not agree, as the appellant here suggests, that it is the SJA's responsibility to craft clemency matters for the convening authority or to otherwise pay tribute to the

6. Testimony of Lieutenant Colonel (LTC) (Chaplain) Scott Davis; testimony of LTC (Chaplain) Richard Pace; unsworn statement of the appellant.

7. This R.C.M. 1105 response by both the appellant and his counsel, and the fact that the Purple Heart was not listed in the appellant's ORB, sufficiently distinguishes this case from *United States v. Demerse,* 37 M.J. 488 (C.M.A.1993).

appellant. The appellant's extensive R.C.M. 1105 submission provided compelling clemency matters and adequately addressed any *perceived* omissions, misstatements, or mischaracterizations in the SJAR. Both the SJA and the trial defense counsel fulfilled their post-trial roles under the Rules for Courts–Martial. Similarly, in addition to the convening authority's prior knowledge of the appellant's service record,[8] the convening authority considered all R.C.M. 1105 matters, as required by R.C.M. 1107(b)(3).

We hold that there was no error or omission in the SJAR or addendum. Assuming, arguendo that the SJAR or addendum contained an error or omission, the appellant has not made any " 'colorable showing of possible prejudice.' " *Wheelus,* 49 M.J. at 289 (quoting *United States v. Chatman,* 46 M.J. 321, 323–24 (1997)).

### B. Sentence Appropriateness

The appellant alleges that his sentence to an unsuspended dismissal is inappropriately severe. The appellant requests that this court reassess the sentence and provide meaningful sentence relief by disapproving the dismissal. We disagree that the sentence is inappropriately severe and, therefore, decline to grant relief.

This court "may affirm only ... the sentence or such part or amount of the sentence, as it finds correct in law and fact and determines, on the basis of the entire record, should be approved." UCMJ art. 66(c). "Sentence appropriateness involves the judicial function of assuring that justice is done and that the accused gets the punishment he deserves." *United States v. Healy,* 26 M.J. 394, 395 (C.M.A.1988). Clemency, as opposed to sentence appropriateness, "involves bestowing mercy." *Id.*

In determining sentence appropriateness, we must give " 'individualized consideration' of the particular accused 'on the basis of the nature and seriousness of the offense and the character of the offender.' " *United States v. Snelling,* 14 M.J. 267, 268 (C.M.A.1982) (quoting *United States v. Mamaluy,* 10 U.S.C.M.A. 102, 106–07, 27 C.M.R. 176, 180–81, 1959 WL 3587 (C.M.A.1959)). The appellant "should not receive a more severe sentence than otherwise generally warranted by the offense, the circumstances surrounding the offense, his acceptance or lack of acceptance of responsibility for his offense, and his prior record." *United States v. Aurich,* 31 M.J. 95, 97 n. * (C.M.A.1990). The punishment should "fit the offender and not merely the crime." *United States v. Wright,* 20 M.J. 518, 519 (A.C.M.R.1985).

When a panel sentences an officer accused, who is otherwise retirement eligible, the military trial judge will instruct the members on the general effect of a punitive discharge and on the effect of a punitive discharge on retirement benefits. Additionally, the military judge will instruct the members accordingly:

> This court may adjudge a dismissal. You are advised that a sentence to a dismissal of a [commissioned officer] is, in general, the equivalent of a dishonorable discharge of a noncommissioned officer, a warrant officer who is not commissioned, or an enlisted soldier. A dismissal deprives one of substantially all benefits administered by the [Department of Veteran's Affairs] and the Army establishment. It should be reserved for those who, in the opinion of the court, should be separated under conditions of dishonor after conviction of serious offenses of a civil or military nature warranting such severe punishment. Dismissal, however, is the only type of discharge the court is authorized to adjudge in this case.

Dep't of Army, Pam. 27–9, Legal Services: Military Judges' Benchbook, p. 70.1 (30 Sep. 1996) (C1, 30 Jan. 1998) [hereinafter Benchbook].[9] When a military judge acts as the sentencing authority, we presume that the

---

8. For example, in his R.C.M. 1105 submission, the appellant notes, *"As you know,* I was awarded three Bronze Stars (one with valor), and a Purple Heart for my actions in combat." (emphasis added). Beyond the adequacy of the SJAR, its addendum, and the R.C.M. 1105 submission, we find nothing in the record to suggest that *this*

convening authority was under informed or misinformed about *this* appellant's service record.

9. This citation is to the version of the Benchbook in effect at the time of the appellant's court-martial.

military judge knew and applied the proper standards, as explained in the instructions. *See generally United States v. Mays,* 33 M.J. 455, 459 (C.M.A.1991); *United States v. Vangelisti,* 30 M.J. 234, 240 (C.M.A.1990).

■ The maximum punishment for appellant's offenses included a dismissal, confinement for eighty-five years, a fine, and total forfeitures. In assessing the appropriateness of appellant's sentence, we consider a number of factors available to the military judge. These factors include, but are not limited to, the appellant's prior good military character, his previous record of good conduct and bravery, his combat record, his financial difficulties, his mental condition, his awards (including combat awards), the extensive character evidence submitted to the court, and his plea of guilty. *See* Benchbook, pp. 99–101. We also consider that the appellant made full restitution prior to action by the convening authority.

We are mindful that the military judge recommended suspension of the sentence, which is not binding on the convening authority. *See* R.C.M. 1108 discussion. At oral argument, appellate defense counsel suggested that the military judge's clemency recommendation somehow indicated that the military judge believed that the adjudged dismissal was inappropriately severe, as a matter of law. We are confident, however, that no military judge would adjudge a sentence that the judge thought too severe or inappropriate in the simple hope that the convening authority would act on the judge's clemency recommendation.

We also must consider the serious nature of the appellant's misconduct, which we need not recount. We add, however, that his detailed scheme included deceiving his wife by altering the bank records from their personal bank account in order to conceal the deposits made from the "Covenant House" account. In so doing, he shielded his activities from perhaps the only person who could have recognized the connection between his crimes

and his gambling addiction and who could have intervened.

With regard to the appellant's gambling addiction, we note that his addiction began as early as 1994. He received treatment for his gambling in 1996 and 1997, but later relapsed. Instead of going back for treatment after his relapse, he continued gambling, using all of his family's savings and borrowing large sums of money from his own parents and his wife's parents. His total gambling losses were close to one million dollars. The experts who treated him concluded he has a gambling addiction brought about by post-traumatic stress disorder from his combat experiences and from the sexual abuse he endured as a child.

Regardless of how sympathetic we may be, or how severe the collateral consequences of the appellant's dismissal, we are compelled to reiterate an earlier point: even though a case may cry out for clemency, we are powerless to grant it. Similarly, we are unwilling to cloak an emotional, equitable clemency argument in legal terms to achieve a particular result.

Considering *all* of the foregoing, we hold that a dismissal is an entirely appropriate punishment in the appellant's case, given: his entire military record; his gambling addiction; his financial difficulties; the nature of the offenses; his detailed, well-crafted scheme to commit those offenses; and his breach of trust and abuse of his position as an officer, supervisor, and clergyman. As a matter of sentence appropriateness, the appellant should be separated under conditions of dishonor.[10]

### C. Disqualification of the Convening Authority as an Accuser

The appellant asserts that the convening authority, Major General (MG) Cavin, was an accuser and should have been disqualified from both referring the charges and taking action on his case. Having failed to raise

---

10. While not engaging in sentence comparison, we have reviewed other recent officer cases in which the appellate court has affirmed the appropriateness of a dismissal. *See United States v. Reed,* 54 M.J. 37 (2000), *aff'g* 51 M.J. 559 (N.M.Ct.Crim.App.1999), *cert. denied,* 531 U.S. 1080, 121 S.Ct. 780, 148 L.Ed.2d 677 (2001); *United States v. Webb,* 53 M.J. 702 (Army Ct. Crim.App.2000), *pet. denied,* 54 M.J. 445 (2001); *United States v. Carpenter,* NMCM 9401878, 1996 WL 927614, 1996 CCA LEXIS 428 (N.M.Ct.Crim. App. June 24, 1996), *aff'd,* 46 M.J. 372 (1997).

this issue at trial or in his clemency submission, the appellant raises the issue for the first time on appeal. Essentially, the appellant asserts that MG Cavin was an accuser because: (1) MG Cavin and he had a close personal and professional relationship; and (2) MG Cavin was his senior rater, and his misconduct was related to MG Cavin's duties, which included supervisory responsibility for the installation chaplains' fund.[11] To remedy this alleged error, the appellant requests that this court set aside the findings and sentence, or, in the alternative, order a new review and action by a different convening authority.

In support of his position, the appellant filed two affidavits.[12] First, his own affidavit states that: (1) the appellant was a senior member of MG Cavin's staff, met with MG Cavin on a regular basis, and served as the principal advisor to MG Cavin regarding "policies that affected religious life and morale within the command;" (2) MG Cavin and his family attended many worship services conducted by the appellant; (3) the appellant, MG Cavin, and their respective families participated in social activities together in each others' homes; and (4) the appellant provided premarital counseling to MG Cavin's daughter, coordinated wedding preparations with MG Cavin and his wife, and officiated at the wedding of MG Cavin's daughter in July 1998. Second, an affidavit from Chaplain (Captain) Milburn essentially indicates that MG Cavin frequently attended Sunday worship services and interacted with the appellant.

Our analysis of this assignment of error requires several steps. First, we review the definition of an "accuser" and review what an accuser should and should not do in the court-martial process. Second, we must determine, on the facts in the record before us, whether MG Cavin was an accuser at any point in the appellant's court-martial process. Finally, we address whether, assuming that MG Cavin was an accuser, the appellant has waived his right to object to the convening authority's referral and action in his case.

Under the UCMJ, an "accuser" is defined as "a person who signs and swears to charges, any person who directs that charges nominally be signed and sworn to by another, and any other person who has an interest other than an official interest in the prosecution of the accused." UCMJ art. 1(9), 10 U.S.C. § 801(9). "An accuser may not refer charges to a general or special court-martial." R.C.M. 601(c). If an officer who is empowered to convene a general court-martial "is an accuser, the court shall be convened by superior competent authority, and may in any case be convened by such authority if considered desirable by him." UCMJ art. 22(b), 10 U.S.C. § 822(b).

"The convening authority shall take action on the sentence and, in the discretion of the convening authority, the findings, unless it is impracticable." R.C.M. 1107(a). It would be "impracticable" for the convening authority to take action "when the convening authority is disqualified because the convening authority has other than an official interest in the case or because a member of the court-martial which tried the accused later became the convening authority." R.C.M. 1107(a) discussion.

The test for determining whether a person is an accuser is "whether, under the particular facts and circumstances with which we are dealing, a reasonable person would impute to him a personal feeling or interest in the outcome of the litigation." *United States v. Gordon*, 2 C.M.R. 161, 166, 1952 WL 1711 (C.M.A.1952). *See also United States v. Nix*, 40 M.J. 6, 8 (C.M.A.1994); *United States v. Jeter*, 35 M.J. 442, 445 (C.M.A.1992); *McKinney v. Jarvis*, 46 M.J. 870, 875–76 (Army Ct.Crim.App.1997). "Personal interests relate to matters affecting the convening authority's ego, family, and per-

---

11. *See* Army Reg. 165–1, Religious Activities: Chaplain Activities in the United States Army, para. 14–4(a) (27 Feb. 1998), which states in part that the commander is responsible for establishing and disestablishing the Chaplains' Fund and for ensuring that the Chaplains' Fund is "audited at least every 2 years, upon a change of Fund Manager, or prior to the consolidation, transfer, or disestablishment of a Chaplains' Fund."

12. Since the appellant's affidavits are not rebutted, this court may decide the legal issue based on the uncontroverted facts. *See United States v. Ginn*, 47 M.J. 236, 248 (1997).

sonal property. A convening authority's dramatic expression of anger towards an accused might also disqualify the commander if it demonstrates personal animosity." *United States v. Voorhees,* 50 M.J. 494, 499 (1999). "Undoubtedly, the prohibition against the convening of a general or special court-martial by an 'accuser' was designed to protect an accused from a vindictive commander seeking to obtain a conviction because of some personal interest in the case and using his power as a convening authority to obtain this result." *Jeter,* 35 M.J. at 446. The appellant's failure to raise the "accuser" issue at trial waives appellate review of the issue, absent plain error. *See id.* at 447 *See generally* R.C.M. 905(e).

 To prevail on a claim that a convening authority should be disqualified as an accuser, the appellant must generally establish that the convening authority developed a personal interest adverse to the appellant, a hostile animus toward the appellant, or a bias against the appellant. For example, our superior court has found a "personal interest" in the following situations:

> [T]he convening authority is the victim of the accused's attempted burglary, *United States v. Gordon,* 1 USCMA 255, 2 CMR 161, 1952 WL 1711 (1952); where the accused tries to blackmail the convening authority by noting that his son was a drug abuser, *United States v. Jeter,* 35 M.J. 442 (CMA 1992); and where the accused has potentially inappropriate personal contacts with the convening authority's fiancée, *United States v. Nix,* 40 MJ 6 (CMA 1994).

*United States v. Dinges,* 55 M.J. 308, 310 (2001).

 The appellant argues that MG Cavin was an accuser because MG Cavin and he had a close personal and professional relationship and because the appellant's misconduct directly reflected on MG Cavin's duty to oversee the CCF. We find the appellant's argument to be speculative and unsupported by the record.

Admittedly, the appellant has established that MG Cavin and he had a personal and professional relationship. Nevertheless, nothing in the record convinces us that this relationship was unusual or different from the relationship that most staff principals would hope to enjoy with their commanding general. The record contains no evidence to cause us to conclude that their *relationship*—however close it may have been—equates to a personal *interest* in the outcome of the appellant's case.

Similarly, the record contains no evidence of the extent of MG Cavin's involvement, if any, with the CCF. We find no evidence that the appellant's crimes embarrassed or personally affected MG Cavin to the extent that he developed a hostile animus toward, or a bias against, the appellant.

In assessing how MG Cavin disposed of the appellant's case, we must start with the fact that the appellant stole over $73,000.00 from the CCF and lied about it. Major General Cavin's decision to relieve the appellant of his duties seems a reasonable, measured response to such a breach of trust. Likewise, MG Cavin's declination to support the appellant's offer to retire in lieu of court-martial [13] was not indicative of a hostile animus or a bias against the appellant. The appellant's crimes were serious and warranted a referral to a general court-martial. The appellant's pretrial agreement permitted the approval of a dismissal, yet it limited the appellant's approved confinement to twenty months and provided that the convening authority would "defer any adjudged confinement for up to 40 days for the purpose of sending COL Mack to the Lewis Stokes Cleveland Veteran Affairs Medical Center, Brecksville Division for treatment." The pretrial agreement does not evidence a hostile animus or a personal interest adverse to the appellant on the part of MG Cavin, but rather a favorable disposition toward the appellant. *See generally Voorhees,* 50 M.J. at 500 ("the convening authority had otherwise demonstrated a favorable disposition toward appellant including a favorable pretrial

---

**13.** The ROT and allied papers do not reflect that the appellant ever submitted a written request to retire in lieu of court-martial. Rather, the appellant's brief indicates that MG Cavin evinced his

lack of support for this administrative disposition during discussions with the appellant's trial defense counsel.

agreement which significantly limited the punishment that appellant would face for his various drug offenses"). As an act of clemency, MG Cavin also disapproved the adjudged forfeitures and waived automatic forfeitures for six months.

After reviewing all of the evidence, we conclude that MG Cavin's actions, both pretrial and post-trial, were nothing but professional. If anything, he demonstrated a favorable disposition toward the appellant, not an impermissible bias against him. Simply because the appellant did not get the clemency he wanted—suspension of the entire sentence—does not mean that the convening authority was biased or had a personal interest in the case. We find that no reasonable person could believe that MG Cavin had a hostile animus, an adverse personal interest, or an impermissible personal bias with respect to the appellant. We hold that MG Cavin was not an "accuser" and therefore, was not disqualified from referring the charges to a general court-martial or from taking initial action in the appellant's case.

Assuming, *arguendo,* that MG Cavin was an accuser, failure to raise the "accuser" issue at trial constitutes waiver, absent plain error. As we find no error, let alone an error that is clear or obvious, and the appellant has not shown material prejudice, we find no plain error under *Powell.*

Accordingly, the findings of guilty and the sentence are affirmed.

Chief Judge WRIGHT and Senior Judge CAIRNS concur.